**RECEIVED**
IN LAFAYETTE, LA.

JUN 2 4 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

CHAD WESTON                                 CIVIL ACTION NO. 04-0664

VS.

COMMISSIONER OF THE SOCIAL            MAGISTRATE JUDGE METHVIN
SECURITY ADMINISTRATION               BY CONSENT OF THE PARTIES

### MEMORANDUM RULING

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, the court

concludes that there is no substantial evidence to support the ALJ's finding that Weston is not

disabled. Accordingly, the Commissioner's decision is **REVERSED**.

### *Background*

Born on August 15, 1977, Chad Weston ("Weston") is currently 27 years old. He quit

school at age 19 while in 5th grade special education classes. Weston has no work experience.

On January 15, 1998, Weston applied for SSI benefits, alleging disability beginning August 1,

1994 due to allergies, nosebleeds, back pain, and deformity of his right hand and leg.[1] Weston's

application was denied on initial review, and an administrative hearing was held on July 29,

1999.[2] In an opinion dated August 20, 1999, the ALJ denied benefits on grounds that although

Weston has a severe mental impairment and sub-average intellectual functioning, his

---

[1] Tr. 85-87, 194-215. Prior to the instant application, Weston filed an application for SSI benefits on April 3, 1997. The application was denied and Weston did not seek reconsideration or appeal, thus, the issue of Weston's disability is res judicata as of August 28, 1997, the date of the unfavorable decision. Rec. Doc. 59-66. *See also* Tr. 327-328.

[2] Tr. 371-420.

impairments did not meet or equal a listed impairment.[3] The Appeals Council granted the

request for review and remanded the case with instructions to obtain, among other things,

updated evidence concerning Weston's mental and physical impairments, as well as a

consultative psychological examination if available.[4] A second administrative hearing was held

on March 10, 2003. The ALJ again found that Weston was not disabled, finding that he retained

the residual functional capacity to perform medium work.[5] Weston appealed the decision to the

Appeals Council, which denied review, making the ALJ's decision the final decision of the

Commissioner from which Weston now appeals.

### Assignment of Errors

Weston alleges that the ALJ erred in finding that Weston's mental retardation did not

render him disabled.

### Standard of Review

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the

Commissioner's decision is supported by substantial evidence in the record; and (2) whether the

decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292;

---

[3] Tr. 307-313.

[4] Tr. 327-329.

[5] Tr. 18-29, 421-278.

Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

### *ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1.  If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.  A person who does not have a "severe impairment" will not be found to be disabled.

3.  A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.  If a person can still perform his past work, he is not disabled.

5.  If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that, despite suffering from borderline intellectual functioning, myopic astigmatism, and deformities of the right leg and hand, Weston could perform medium level work with: 1) limitations on his ability to push and pull; 2) only occasional fingering with his right hand; 3) no complex work; 4) work that involves only

occasional interaction with general public; and 4) work that does not require excellent visual acuity.[6]   Relying upon the testimony of the vocational expert, the ALJ found that Weston could perform a significant number of jobs which exist in the local and national economies, and therefore he was not disabled.[7]   After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. § 405(g), the court concludes that the ALJ's findings and conclusions are not supported by substantial evidence in the record.

### Findings and Conclusions

## 1. PERTINENT MEDICAL HISTORY

**Physical impairments:** On May 20, 1998, Weston was examined by Dr. W.J. Briley, an internist,  at the request of the Disability Determination Services ("DDS").  Dr. Briley noted that Weston's physical exam was normal, and stated, "[e]xcept for the history of being a slow learner, I find no medical abnormalities that would restrict this person's ability to perform work related activities."[8]

On July 24, 1998 and October 7, 1999, Weston underwent consultative eye examinations by Dr. Kenneth Lafleur, an ophthalmologist.[9]  Dr. Lafleur diagnosed myopic astigmatism, anisometropia,[10] and amblyopia of the right eye.[11]  Dr. Lafleur found that Weston's visual

---

[6] Tr. 24.

[7] Tr. 27.

[8] Tr. 260.  Dr. Briley's report from May, 1997 indicates that Weston's right leg is three inches shorter than his left leg.  Tr. 264.

[9] Tr. 272-275.

[10] The condition in which the two eyes have an unequal refractive power.  *See* www.medterms.com.

[11] Partial or complete loss of vision in one eye caused by conditions that affect the normal development of vision. *See* www.medterms.com.

impairments preclude him from climbing or working at heights, operating machinery, being

exposed to dust or fumes, and engaging in contact sports. Dr. Robert Casanova, an

ophthalmologist, concurred in Dr. Lafleur's diagnosis and added the restriction that Weston not

read fine print.[12]

**Mental impairment:** On July 7, 1997, at the request of DDS, Weston was examined by

Paul Friedberg, Ph.D.[13] A Wechsler Adult Intelligence Scale Revised yielded a full-scale IQ

score of 59, verbal IQ of 64 and performance IQ of 57. The examiner concluded that "Chad did

not appear to exert maximal effort. It is felt that he most likely functions in the Mild Mentally

Disabled to Borderline range. He appears to have some neurological involvement on his right

side that is to a mild degree. It is questionable whether or not he can manage his benefits."[14]

On September 29, 1998, at the request of DDS, Weston underwent a psychological

consultative evaluation with Dr. Alfred E. Buxton, Ph.D.[15] Dr. Buxton administered the Folstein

Mini Mental State Exam and the Scales of Independent Behavior-Revised, however, Dr. Buxton

concluded that he was unable to obtain valid scores:

> IMPRESSIONS AND RECOMMENDATIONS: Chad Keith Weston is a 21 year
> 1 month old single black male resident of Opelousas, Louisiana, seen on
> September 19, 1998, as per the request of DDS. He presents in a bogus or
> otherwise fake bad response set on this occasion. There may be a very mild right
> hemiparesis but nothing outstanding is noted and this apparently was congenital
> by nature and one would suspect by now he has learned to compensate and adapt
> fairly well to this minor handicapping condition. Cognitive functional status has
> been assessed in the past with variable results and on this occasion he is of

---

[12] Tr. 293.

[13] Tr. 248-249.

[14] Tr. 249.

[15] Tr. 266-269.

subaverage general intellect but the clinical impression is that he is not mentally retarded, per se. The question was where he is functioning adaptively and again secondary to his presentation style on this occasion this is not assessable in any accurate fashion. However, it is certainly not as low as he attempts to present it on this occasion and if one believed this was a valid representation of functioning, then he would be no better than severe to moderately mentally retarded. Although he reads and writes fairly well and can recreate geometric figures and such, this would be highly irregular and inconsistent for anybody functioning at the level he attempts to present on this occasion.[16]

On February 28, 2002, Dr. Naomi Friedberg, Ph.D., examined Weston at the request of DDS when the case was remanded to the ALJ for further proceedings by the Appeals Council.[17] A Wechsler Adult Intelligence Scale III yielded a full-scale IQ score of 51, verbal IQ of 55 and performance IQ of 56. Dr. Friedberg noted that Weston was in the mild mentally disabled to moderately mentally disabled range.[18] Dr. Friedberg concluded that these results were valid and reliable:

> Mr. Weston appeared to put forth adequate effort in completing subtest tasks. However, he did not appear to understand many subtest task instructions, or the concept of what he needed to do to respond to test items. There were times when Mr. Weston appeared to be confused even after several explanations of some subtest task instructions. This confusion and difficulty understanding appeared to be legitimate, and due to cognitive limitation. Therefore, the results of this evaluation are considered to be valid and reliable.[19]

Dr. Friedberg concluded that Weston would have "great difficulty" in structured employment and that he was incapable of managing his own affairs.

---

[16] Tr. 269.

[17] Tr. 297-300.

[18] Tr. 298.

[19] Tr. 298.

## 2. APPENDIX I LISTING

The central issue in this case is whether there is substantial evidence to uphold the ALJ's finding that Weston did not meet the requirements for an Appendix 1 listing for adults, 20 C.F.R., Part 404, § 12.05. The requirements for mental retardation under §12.05 are as follows:

> (B) A valid verbal, performance, or full scale IQ of 59 or less; or

> (C) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

In the instant case, the ALJ did not make a determination whether Weston was indeed functioning in the mentally retarded range. The ALJ simply discounted the IQ scores and relied upon the testimony of a non-examining clinical psychologist, Jimmie D. Cole, Ph.D. A review of Dr. Cole's testimony, however, shows that his conclusions about Weston's IQ were based upon the flimsiest of evidence. If the IQ scores are unreliable, so is Dr. Cole's testimony. This leaves the record as a whole lacking substantial evidence for the ALJ's conclusions.

Dr. Cole testified at the administrative hearing as a medical expert, having been designated by the Commissioner for Social Security to express opinions on whether claimants "have impairments or combination of impairments which meet or are medically equivalent to the Commissioner's listing of impairments."[20] At the time of the hearing, Dr. Cole had reviewed Weston's medical record, but he had never examined Weston. At the administrative hearing, however, Dr. Cole was allowed to ask Weston some questions, as follows:

> Q.     Would you sign your name for me on the paper, please?

---

[20] Tr. 454.

A.    Right there?

Q.    Uh-huh. Okay. So I think you must have signed this back here. You did fill some papers out for Social Security?

A.    Yes, sir.

Q.    Look at this here. Is that your writing there?

A.    I don't know.

Q.    Can you read any of that, what it says here. Start with the I. What does that say?

A.    I also have nose bleeds.

Q.    Okay. But you didn't write that though, you don't think?

A.    I don't know.

Q.    And then there's, does that look like maybe more like you wrote that? Remember that?

A.    I don't know.

Q.    Pain, pain in my low, in my low back and my head, the top of my head.

A.    Okay. Thank you.[21]

Later in the hearing, the ALJ questioned Dr. Cole regarding whether Weston met a listed

impairment:

Q.    Dr. Cole, we seem to have a rather wide range of scores that Mr. Weston has achieved over the years. Based on your review of these scores, I guess the initial question is in your opinion is Mr. Weston mentally retarded?

A.    Well, the first few times he got the lower scores there was evidence, well, the first time he got the lower scores, which were in the 50's, and then Dr. Buxton, both of those psychologists felt that he didn't exert his maximum effort and there was some faking with it. What then changes that then [sic] in this one in 2002, a psychologist saw him and he got the same low scores, but she felt that they were

---

[21] Tr. 440-441.

valid. I asked him here to do a little reading for me. Generally a person with an IQ of 55, 51 on full scale, would not be able to read as he did for me. So looking at the overall record and what's presented here, it would appear that in my opinion that he would be more in the borderline range of intelligence rather than in this moderate range of mental retardation.[22] * * *

Weston's attorney then engaged Dr. Cole in the following colloquy:

Q.    Dr. Cole, Dr. Naomi Freeburg [sic] felt that her IQ testing was valid, did she not?

A.    Yes, she did.

Q.    And in doing so I would assume that she would have had the opportunity to ascertain whether or not Mr. Weston was capable of reading or not.

A.    Possibly. She didn't do any tests that I see here that would indicate that, but she would have had the opportunity.

* * *

Q.    And as you stated, that someone in that range of IQ most probably would not be able to read, but certainly you're not going to say that from doing that you could determine anything about, or not determine anything, but you couldn't determine his IQ or how he would test on that.

A.    No, I didn't mention all test (INAUDIBLE) evaluation.

Q.    And assuming that if Dr. Freeburg's [sic] IQ testing was valid, his condition would satisfy the listing, would it not?

A.    Yes, it would.

* * *

A.    Taking her report in and of itself and looking at that, yes, he does meet the listings, and there is support for that in her report. Looking at everything else and listening to his interaction with us here today, I think that he is more than borderline. That's what I would comment on.

Q.    Okay. Is it your opinion that perhaps Ms. Freeburg's testing was not as valid as she felt it was?

---

[22] Tr. 455-456.

A.    Well, maybe that day it was something different. I don't know. The overall picture, ways of interacting and what's going on now, it appears to me and my opinion is that he's more in the borderline range --[23]

The foregoing shows that Dr. Cole's opinion was founded upon a few questions he directed at Weston during the hearing and his observation of Weston's "interaction" at the hearing. Dr. Cole did not examine Weston, and Dr. Cole admitted that he could not provide IQ scores based on his limited exposure to Weston. Further, Dr. Cole testified that if Dr. Freidberg's test scores were valid, Weston met a listed impairment under §12.05. Despite this, the ALJ does not discuss whether or not Weston's IQ scores as determined by Dr. Freidberg were valid. Instead, the ALJ simply relied on Dr. Cole's rather uninformed opinion to conclude that Weston does not meet the requirements of §12.05. The ALJ stated, in pertinent part:

> In further support of the above finding, the undersigned Administrative Law Judge arranged for Jimmie D. Cole, Ph.D., an impartial medical expert, to appear and testify at the hearing. In summary, Dr. Cole testified that the claimant has been evaluated by five psychologists with findings of borderline intellectual functioning and mild to moderate ranges of mental retardation. Dr. Cole stated that a person with an IQ of 51 to 55 cannot read as the claimant did and he would be more in the borderline range of intellectual functioning. The records also indicate some situational mild depression at times. Dr. Cole concluded that the claimant's impairments do not meet or equal any listed impairment and he would be capable of one to two step simple activities with close supervision and limited contact with the public. Specifically, Dr. Cole opined that the claimant did not qualify for a diagnosis of "mental retardation," and therefore did not meet or equal listing 12.05.

An ALJ cannot rely on the opinion of a non-examining physician over that of a treating specialist. See, e.g., Barbee v. Barnhart, 2002 WL 31688886, *2 (5th Cir. 2002), citing Newton v. Apfel, 209 F.3d 448, 456-57 (5th Cir.2000) (cannot rely on opinion of non-examining

---

[23] Tr. 458-461.

physician over that of treating specialist); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir.1990) (ALJ may rely on a non-examining physician's assessment only where it does not contradict the examining physician); 20 C.F.R. §404.1527(d)(1) ( "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). Because the ALJ relied upon the opinion the non-examining medical expert over the opinion of an examining psychologist, the undersigned concludes that Dr. Cole's testimony does not amount to substantial evidence in support of the ALJ's decision.

Moreover, at no point in the decision does the ALJ address which IQ scores he found valid and which invalid. There is no conclusion whatsoever concerning Weston's IQ and which paragraph of §12.05 was applicable to his case. Instead, the ALJ noted that the record contained two sets of IQ scores, but deferred to a non-examining medical expert's opinion that someone with an IQ of 51 to 55 could not "do a little reading" as Weston did for him, and therefore, the IQ scores were not an accurate assessment of Weston's abilities.[24]

Dr. Naomi Freidberg indicated that Weston was greatly confused by the material presented in the intellectual testing and that is one of the reasons she concluded that the resulting IQ score of 51 was valid and reliable.

Even the ALJ's credibility issues with Weston are not adequately supported by the record, and therefore cannot be construed as providing a basis for his decision to ignore the IQ scores indicating that Weston is at best mildly mentally retarded. For instance, the ALJ stated, "The claimant testified to a low educational level, some deficits in using his right arm and leg, vision problems and headaches. However his testimony was inconsistent and not fully supported by

---

[24] Tr. 456.

objective medical evidence." The ALJ fails to explain this conclusion, and in fact, the record is replete with support for the Weston's contentions – he quit the 5[th] grade at age 19 because he was simply too old to continue, he has been diagnosed with vision problems, and his right leg is shorter than his left. Thus, the ALJ's conclusory credibility determination does not support his decision to dismiss the IQ scores indicating that he was mentally retarded.

The record lacks any evidence, much less substantial evidence, that Weston has an IQ of 70 or above. Clearly if the IQ scores of 51 and 55 are considered valid, Weston meets the requirements of §12.05(B) and would be found disabled. Additionally, if the IQ score of 64 is considered valid, the assessment of his application would fall under §12.05(C), and he would meet the first requirement of a listing impairment under that paragraph, i.e., he has a valid IQ score between 60 and 70. The second prong of §12.05(C) requires "a physical or other mental impairment imposing additional and significant work-related limitation of function." The impairment need not be disabling in itself:

> If the plaintiff's physical impairment were required to be independently disabling, §12.05(C) would be rendered meaningless. Therefore, something less than a preclusion from any substantial gainful employment must apply.

Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir.1985).

Section 12.00(A) defines "significant work-related limitation of function" as a "severe impairment:"

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are 'severe' as defined by § 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes 'an additional and significant work-related limitation of function' even if you are unable to do your past work because of the unique features of that work. . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00A (1997).

The definition of "severe impairment" in the Fifth Circuit is well-settled: "an impairment can be considered as not severe only if it is a slight abnormality which has such minimal effects on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Estran v. Heckler, 745 F.2d 340, 341 (5th Cir.1984); Stone v. Heckler, 752 F.2d 1099 (5ᵗʰ Cir.1985); Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir.1992).

In the case at bar, the ALJ found the following impairments to be severe: "borderline intellectual functioning, myopic astigmatism, and deformities of the right leg and hand."[25] In fact, the ALJ reduced Weston's residual functional capacity to perform work because he had limited ability to push and pull, he could not perform work requiring "excellent visual acuity," and he could only occasionally finger with his right hand.[26]

As discussed above, Weston's additional impairments do not have to be disabling in and of themselves. Instead, the issue is whether the impairment is only a slight abnormality which has such minimal effects on Weston that it would not be expected to interfere with her ability to work. See Stone v. Heckler, supra. The ALJ's own finding is that Weston had severe impairments in addition to his mental impairment.

Considering that the record is void of any evidence that Weston has an IQ above 70 and he has impairments which impose additional and significant work-related limitations, the court

---

[25] Tr. 20.

[26] Tr. 24.

finds that substantial evidence does not support the ALJ's finding that Weston does not meet or

equal a listing impairment. Accordingly, the ALJ erred in finding that Weston was not disabled,

and Weston is awarded SSI benefits consistent with an onset date of August 28, 1997.

### *Conclusion*

Considering the foregoing, the Commissioner's decision is **REVERSED**.[27]

Signed at Lafayette, Louisiana on June 23, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[27] This constitutes a "final judgment" that triggers the filing period for an EAJA fee application. Shalala v. Schaeffer, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); Freeman v. Shalala, 2 F.3d 552 (5th Cir. 1993).